Filed 4/21/21  Fireman's Fund Ins. Co. v. Triton Subs, Inc. CA1/3

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| FIREMAN'S FUND INSURANCE COMPANY,<br><br>      Plaintiff and Respondent,<br><br>v.<br><br>TRITON SUBS, INC., et al.,<br><br>      Defendants and Appellants. | A158653<br><br>(City and County of San Francisco Super. Ct. No. CGC15544547) |

An electrical fire originating in a Quizno's Corporation (Quizno's) sandwich store damaged it and neighboring stores, spawning several lawsuits against Quizno's.  After a jury found Triton Subs, Inc. (Triton), a Quizno's agent, performed actions that were a substantial cause of the fire but within the scope of its agency relationship, Quizno's settled the lawsuits.  Its insurer, Fireman's Fund Insurance Company (FFIC) paid over $7 million in satisfaction of the settlement.  FFIC then filed a complaint against Triton for indemnification, and a jury returned a verdict in favor of FFIC.  On appeal, Triton primarily argues that FFIC was collaterally estopped from litigating its indemnification claim, that the trial court improperly

1

interpreted Triton's indemnity obligations, and that the evidence was insufficient to support the jury's verdict. We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

### A. Triton, Quizno's Area Director

Quizno's is a business that operates casual deli and submarine sandwich restaurants. In 1997, Triton entered into an Area Director Marketing Agreement (Agreement) with Quizno's to serve as its Area Director, a position tasked with recruiting and assisting Quizno's franchisees to build and open new Quizno's stores throughout California. Triton was responsible for coordinating renovation contractors and architects for each restaurant, providing the franchisee with Quizno's building and interior design specifications, and submitting forms and reports related to leases and construction to Quizno's. Triton was also required to inspect each franchisee store for compliance with the specifications, standards, and operating procedures included in the Quizno's Architecture and Construction Manual (Manual).

### B. City of Monterey Quizno's Store

In 2003, Triton assisted a franchisee, Harinder Paul Deol, in locating a space to renovate for a Quizno's store in the City of Monterey (Monterey). Architects drafted plans based on Quizno's specifications, Monterey approved the plans, and the plans were then sent out for contractor bids. Any contractor had to be approved by Quizno's corporate office, a process that entailed review of the contractor's references, financial reserves, insurance, and construction licenses. Triton presented Deol with bids from three contractors on Quizno's approved contractor list, but Deol rejected them as too expensive. Triton then recommended Pat Young, a contractor who was not on the approved list and whose bid was less than half of the other bids.

2

Deol accepted Young's bid, and they signed an agreement that they would comply with the Manual, builder's handbooks specifications, and electrical drawings. Notably, the Manual required that "all wiring shall be run in conduit"—that is, placed in metal or plastic tubing to protect the wire during construction and to protect surrounding people or objects from any wire failure. But rather than encasing the wires for an industrial size toaster oven in a conduit, Young's employee nailed them to joists in the ceiling, a design that was not identified in the plans approved by Monterey. Deol operated the store for over one year, then sold his franchise stake to Fancher Monterey, Inc in 2005.

## C.   *Fancher Monterey, Inc. v. Avila Design et al.* and FFIC's Indemnification Complaint

In February 2007, an electrical fire started on the basement ceiling of the Quizno's store, causing significant damage to the store and several adjacent stores. The next year, a complaint was filed against Quizno's, Triton, and other co-defendants in *Fancher Monterey, Inc. v. Avila Design et al.* (*Fancher*), alleging they negligently constructed the Quizno's store. A jury found: (1) the cable supplying power to a toaster oven in the Quizno's restaurant was a substantial factor in causing the fire; (2) Quizno's and Triton were both negligent and substantial factors in causing the fire; and (3) Triton performed its actions as a Quizno's agent and within the scope of its agency. Because the jury found that all of Triton's conduct was within the scope of its agency with Quizno's, it allocated all of Triton's fault to Quizno's. Quizno's then settled with claimants for approximately $7.7 million, and FFIC paid those settlements on Quizno's behalf.

In 2015, FFIC filed a complaint against Triton, alleging FFIC defended Quizno's in *Fancher*, and thus became subrogated to Quizno's rights to recover Quizno's settlement payments and defense costs in *Fancher* based on

3

an express indemnity provision in the Agreement. A jury determined Triton must indemnify Quizno's because the fire arose out of Triton's actions, and it awarded FFIC approximately $7.8 million.

## DISCUSSION

On appeal, Triton challenges several trial court rulings construing the indemnity provision in Section 18.4 of the Agreement. Section 18.4 requires Triton "to indemnify and hold [Quizno's and its officers, employees, agents, and others] harmless against, and to reimburse them for, any loss, liability, taxes or damages (actual or consequential) and all reasonable costs and expenses of defending any claim brought against any of them . . . which any of them may suffer, sustain or incur by reason of, arising from or in connection with any acts, omissions or activities of [Triton] or any employee of or independent contractor engaged by [Triton], not in accordance with this Agreement."

Section 19.1, the Agreement's choice of law provision, mandates the application of Colorado law to address substantive disputes. (*Airs Aromatics, LLC v. CBL Data Recovery Technologies, Inc.* (2020) 50 Cal.App.5th 1009, 1014 [policy favoring enforcement of contractual choice of law provision].) However, "[i]t is well established that while the courts generally enforce the substantive rights created by the laws of other jurisdictions, the procedural matters are governed by the law of the forum" state—here, California. (*World Wide Imports, Inc. v. Bartel* (1983) 145 Cal.App.3d 1006, 1012.) With this framework, we review each of Triton's arguments.

### A. Collateral Estoppel

Triton contends collateral estoppel barred FFIC's indemnification claim because the central issue—whether the fire was caused by Triton's acts "not in accordance with this Agreement"—is identical to the *Fancher* jury

4

verdict—finding Triton negligently performed its acts within the scope of its agency with Quizno's. In Triton's view, the indemnity provision phrase "not in accordance with this Agreement" has the same meaning as "outside the scope of agency," or an ultra vires act. It argues the jury in *Fancher* conclusively absolved Triton of any fault by finding it acted within the scope of its agency relationship with Quizno's, and FFIC cannot relitigate that issue now. Rejecting this argument, the trial court noted the two issues were different since an "agent can act within the scope of his agency yet still breach the contract he has with the principal." We see no error in the court's ruling.

Collateral estoppel "precludes relitigation of issues argued and decided in prior proceedings." (*Lucido v. Superior Court* (1990) 51 Cal.3d 335, 341 (*Lucido*); Code Civ. Proc., §§ 1908 [conclusiveness of judgment], 1911 ["Judgment; Items adjudged"].) The doctrine applies when the issue sought to be relitigated (1) is identical to that decided in a former proceeding; (2) was actually litigated; (3) was necessarily decided in the former proceeding; (4) has a final decision on the merits; and (5) the party against whom preclusion is sought is the same as, or in privity with, the party to the former proceeding. (*Lucido*, at p. 341.) The party asserting collateral estoppel must satisfy each requirement, and we review the trial court's ruling de novo. (*Ibid.*; *Roos v. Red* (2005) 130 Cal.App.4th 870, 878.)

At the outset, Triton misapprehends the *Fancher* jury findings. The jury *did* find Triton at fault because its acts were a substantial cause of the fire. The verdict form simply instructed the jury, if it found Triton was negligent and "such negligence was within the scope of the agency for Quizno's," to apportion Triton's percentage of fault to Quizno's. The jury determined the negligence was in the scope of the agency relationship, and

5

then—following the verdict form's instruction—allocated zero percent fault to Triton and 80 percent fault to Quizno's. The exact percentage of fault between Triton and Quizno's was undetermined. For that reason, this case is not comparable to *Columbus Line, Inc. v. Gray Line Sight-Seeing Companies Associated, Inc.* (1981) 120 Cal.App.3d 622, relied upon by Triton. There, a trial court found that the defendant Gray Line was not negligent towards plaintiffs and that it did not have an agency relationship with either co-defendant, thus collateral estoppel precluded the co-defendant's indemnity claim against Gray Line. (*Id.* at p. 629.) Here, the *Fancher* jury found both— that Triton was negligent and that it had an agency relationship with Quizno's—providing a proper basis for Quizno's indemnity claim against Triton. (*Ibid.*)

More importantly, the contract indemnification issue in FFIC's complaint is not identical to the issues in *Fancher*. The "identical issue" element under the collateral estoppel doctrine addresses whether " 'identical factual allegations' are at stake in the two proceedings, not whether the ultimate issues or dispositions are the same." (*Lucido, supra*, 51 Cal.3d at p. 342.) The *Fancher* complaint alleged that Quizno's, by and through its agents and representatives, negligently participated in building the Monterey store. Here, the central issue is whether the fire resulted from Triton's acts or omissions "not in accordance with this Agreement," that is, whether Triton breached its contract. The Agreement's "Scope of Appointment" provision outlines the scope of Triton's agency: "(1) solicit prospective Franchisees for QUIZNO'S Restaurants . . . ; (2) perform certain site acquisition and development services described in [the Agreement]; and (3) to render support and other services . . . described in [the Agreement]." That same provision requires Triton "to perform its obligations, as a special agent of [Quizno's] in

6

accordance with the terms and conditions" that appear throughout the Agreement.

Assessing the manner in which Triton performed its duties under the Agreement is not the same as whether Triton acted within the scope of its agency relationship with Quizno's. (See *Lucido, supra,* 51 Cal.3d at p. 342.)[1] Indeed, Triton acknowledged as much in the trial court, noting Triton triggered its indemnity obligations if it acted beyond the scope of its agency relationship *or* if it "act[ed] in an inappropriate manner inside the scope of the agreement." Also off the mark is Triton's further insistence that FFIC's claim is baseless because a principal is generally liable for an agent's conduct within the scope of its agency. FFIC's complaint addresses a contractual obligation to indemnify, not common law indemnity or agency principles. Because Triton fails to establish that the issues are identical, its collateral estoppel argument is unavailing.[2]

---

[1] Triton makes a perfunctory argument that the trial court erred because it did not instruct the jury that the phrase "not in accordance with" means "beyond the scope of agency." We reject this claim because Triton fails to provide any cogent analysis, citation, or relevant authority to support it. (*Associated Builders & Contractors, Inc. v. San Francisco Airports Com.* (1999) 21 Cal.4th 352, 366, fn. 2.) In any event, the claim fails for the same reasons stated above. (See *Bush v. State Farm Mut. Auto. Ins. Co.* (Colo.Ct.App. 2004) 101 P.3d 1145, 1146 [courts give contract "words their plain meaning, avoid strained and technical interpretations, and construe the contract as would a reasonable person of ordinary intelligence"].)

[2] In light of this conclusion, we do not address Triton's arguments that the *Fancher* verdict was sufficiently final for the collateral estoppel doctrine to apply. (See *Lucido, supra,* 51 Cal.3d at p. 341.) We further reject Triton's request for judicial notice of documents demonstrating the finality of the *Fancher* verdicts because they are not necessary for our determination.

## B. Indemnity for Quizno's Negligence

Triton nonetheless maintains the Agreement's indemnity provision does not require it to indemnify Quizno's for Quizno's own negligence because the provision lacks the requisite clear and unequivocal language to support that construction. Triton further claims that indemnity for one's own fault is unenforceable under Colorado public policy, and that the trial court erred in ruling otherwise. We are not persuaded.

### 1. *Construction of the Agreement*

In Colorado, indemnity agreements purporting to hold indemnitees harmless for their own negligence are strictly construed. (*Public Service Co. v. United Cable, Inc.* (Colo. 1992) 829 P.2d 1280, 1284 (*Public Service*).) "[W]hile indemnity contracts are generally construed to effectuate the parties' intentions . . . 'indemnity contracts holding indemnitees harmless for their own negligent acts must contain clear and unequivocal language to that effect.'" (*Id.* at p. 1283.) A court will give effect to the contract's plain language if it is unambiguous, meaning it is not "susceptible to more than one reasonable interpretation." (*Ad Two, Inc. v. City & County. of Denver* (Colo. 2000) 9 P.3d 373, 376.)

In *Public Service*, the Colorado Supreme Court determined the following language required a party to indemnify an indemnitee for its own negligence: "Licensee shall indemnify and save and hold harmless [Public Service] . . . from and against all claims, liabilities, causes of action, or other legal proceedings by third parties for damage . . . in any way arising out of, connected with or resulting from the exercise by Licensee of the rights granted to it hereunder." (*Public Service, supra*, 829 P.2d at p. 1282, italics omitted.) As the court explained, language covering *any* liability "indicates an intent to include claims arising from [the indemnitee's] negligence." (*Id.*

8

at p. 1283.) "The use of the word 'liabilities' is significant because it covers those instances where [the indemnitee] is legally liable for damages, including those where liability arises because of its own negligence." (*Ibid.*) Second, language that requires indemnification for the costs of defense also "strengthens an interpretation that the parties intended to indemnify [indemnitee] from all risks and costs, including those arising from its own negligence." (*Ibid.*)

Here, the Agreement contains language similarly evincing Triton's intent to indemnify Quizno's for its negligence. First, Triton agreed "to indemnify and hold [Quizno's] . . . harmless . . . for, any loss, liability, . . . or damages" in connection with Triton's acts or omissions. Although the provision does not expressly mention Quizno's negligence, that failure does not "render[] an otherwise unambiguous indemnity provision insufficient to indemnify the indemnitee from its own negligence." (*Public Service, supra,* 829 P.2d at p. 1283.) Second, the provision requires Triton to indemnify and reimburse Quizno's for "defending any claim brought against any of them." As in *Public Service*, the indemnity provision here was properly upheld because "the language clearly and unambiguously expresses the intent of the parties." (*Ibid.*) Moreover, in commercial settings like this one, courts are "willing to find broad language of indemnity holding another harmless against liability generally, without any specific reference or limitation to its own negligence, to constitute an adequate expression of intent to indemnify." (*Constable v. Northglenn, LLC* (Colo. 2011) 248 P.3d 714, 716 (*Constable*).)

Triton argues the Agreement limits indemnity to only Triton's conduct, a limitation that it claims did not exist in the indemnity provision at issue in *Public Service, supra,* 829 P.2d 1280, and that it asserts is one the Colorado Supreme Court deemed significant. This argument is based on an incorrect

9

reading of *Public Service*. Like the indemnity language here, the *Public Service* provision required that the indemnitor hold the indemnitee harmless for *all liabilities* for damages arising out of "the exercise by [Indemnitor] of the rights granted to it hereunder" (*id.* at p. 1282, italics omitted), and consequently, the provision imposed an obligation to indemnify the indemnitee for the indemnitee's negligence (*id.* at p. 1283). And contrary to Triton's assertions, *Public Service* reached that conclusion despite the circumstance that the indemnity provision at issue expressly referenced the indemnitor's negligence without any corresponding mention of the indemnitee's negligence. (*Id.* at pp. 1283–1284 & fn. 4 [distinguishing *U.S. v. Seckinger* (1970) 397 U.S. 203, 217]; compare with *Constable*, *supra*, 248 P.3d at p. 717 [express exclusion of indemnitee's *gross* negligence or intentional torts from the defendant's indemnity obligation indicated the parties contemplated indemnification of indemnitee's negligence].) Here, not only did the Agreement expressly provide that Triton would indemnify and hold Quizno's harmless against "any loss, liability, . . . or damages," but the Agreement contained no express exclusions regarding Quizno's negligence.

We do not agree with Triton that the differences between the Agreement's indemnity language and the provisions in *Public Service* and in *Lafarge North America v. K.E.C.I. Colorado* (Colo.Ct.App. 2010) 250 P.3d 682 compel a reversal. The language is not qualitatively different, and thus not functionally distinguishable. (See *Lafarge*, at p. 686 [finding the phrase "arising in whole or in part" from K.E.C.I.'s acts and omissions comparable to the language "in any way" in *Public Service*].) Thus, while the Agreement lacks the exact language of the provision in either *Public Service* or *Lafarge*, it is nonetheless explicit in requiring indemnification for any loss or liability and all reasonable costs of defense for any claim arising out of or connected

10

with Triton's acts or omissions not in accordance with its obligations under the Agreement. Such language "supports an interpretation that the parties intended that [indemnitee] be indemnified for its own negligence." (*Public Service*, *supra*, 829 P.2d at p. 1283.)

Other cases that Triton cites are distinguishable because the indemnity provisions either employed equivocal language (e.g., *U.S. Brass Corp. v. Dormont Mfg. Co.* (10th Cir. 2007) 242 Fed.Appx. 575, 577–579; *Boulder Plaza Residential, LLC v. Summit Flooring, LLC* (Colo.Ct.App. 2008) 198 P.3d 1217, 1220–1222), or did not sufficiently evince an intent to hold the indemnitee harmless for its own negligence (e.g., *Williams v. White Mountain Constr. Co.* (Colo. 1988) 749 P.2d 423, 425–426 [involving ambiguous oral statements made on spur of the moment]). Moreover, we reject Triton's invitation to review cases outside of Colorado since they are not controlling here.

Triton additionally claims that *Brochner v. Western Ins. Co.* (Colo. 1986) 724 P.2d 1293 (*Brochner*) bars indemnity for a principal's own negligence as a matter of the public policy reflected in Colorado's anti-indemnity statute. We are not convinced. First, Colorado public policy precludes making an agreement to indemnify parties for damages resulting from their own *intentional or willful wrongful acts*, but not their own negligence. (*Constable*, *supra,* 248 P.3d at p. 716.) Second, *Brochner* was a case abolishing the common law doctrine of indemnity between two joint tortfeasors; it did not change Colorado's law on contractual indemnity. (*Brochner*, at p. 1299.) Moreover, even if a contract provision were not at issue here, which we do not find, the *Brochner* court expressly reserved the "question of whether the common law doctrine of indemnity should be preserved or abolished in situations where the party seeking indemnity is

11

vicariously liable or is without fault." (*Id.* at p. 1298, fn. 6.)[3] Those are the circumstances here. In sum, Triton is liable under the Agreement to indemnify Quizno's for any negligence on its part.

## 2. *Special Verdict Form*

As relevant here, the jury received a special verdict form that asked: "Did Triton act not in accordance with the [Agreement]?" and if so, "Did the fire at the Monterey Quizno['s] result from, arise out of, or in connection with Triton's acts not in accordance with the [Agreement]?" Triton challenges the special verdict form as incomplete because it did not permit the jury to allocate fault between Triton, Quizno's, and third parties. After reviewing the special verdict form de novo, we find no flaw. (*Saxena v. Goffney* (2008) 159 Cal.App.4th 316, 325 (*Saxena*).)

A special verdict "must present the conclusions of fact as established by the evidence." (Code Civ. Proc., § 624.) It is "fatally defective" if it does not allow the jury to resolve every controverted issue. (*Saxena, supra*, 159 Cal.App.4th at p. 325.) Here, the special verdict form tracked the language in the Agreement's indemnity provision. Notably, the provision contained no language limiting Triton's liability to a percentage of the damages based on

---

[3]     We do not address Triton's additional argument that the Agreement is a construction contract—a contract that involves design, planning, supervision, and inspection of a building site—rendering the Agreement's indemnity provision void as a matter of Colorado public policy. (C.R.S. § 13–21–111.5, subds. (6)(b), (e)(II) [defining "construction agreement"].) Triton's failure to make that claim below forfeits its review on appeal. (*P&D Consultants, Inc. v. City of Carlsbad* (2010) 190 Cal.App.4th 1332, 1344.)

While this case was being briefed, FFIC requested we take judicial notice of several documents related to the Colorado anti-indemnity statute, and we deferred a ruling until consideration of the appeal. (*People v. Preslie* (1977) 70 Cal.App.3d 486, 493–494.) We now deny the request because the documents are not relevant to this appeal. (*Jordache Enterprises, Inc. v. Brobeck, Phleger & Harrison* (1998) 18 Cal.4th 739, 748, fn. 6.)

12

its percentage of fault, such as "to the extent" that any injury or damage is caused by an indemnitor, and instead it required Triton to indemnify Quizno's for its own negligence. Accordingly, the jury had no reason to determine the parties' comparative fault. The questions in the special verdict form properly set forth the conclusions of fact for every controverted issue.

## C. Acts "Not in Accordance" with Agreement

Triton contends there was insufficient evidence that its acts or omissions triggered a contractual obligation to indemnify Quizno's. In essence, Triton claims that the Agreement did not require it to inspect or report on construction work and that there was no evidence showing it otherwise failed to act in accordance with the Agreement.

Challenges to the sufficiency of the evidence are subject to a substantial evidence standard of review. (*U.S. Ecology, Inc. v. State of California* (2005) 129 Cal.App.4th 887, 908 (*U.S. Ecology*) [breach of contract case]; see *Albright v. McDermond* (Colo. 2000) 14 P.3d 318, 322 [deference to trial court factual findings].) "We review the evidence in the light most favorable to the respondent, resolve all evidentiary conflicts in favor of the prevailing party and indulge all reasonable inferences possible to uphold the jury's verdict." (*U.S. Ecology*, at p. 908.)

### 1. *Section 13.1, Standards of Service*

Section 13.1 of the Agreement, titled "Standards of Service," required that Triton adhere "to the highest standards of honesty, integrity, fair dealing and ethical conduct" in all dealings with franchisees. FFIC claims Triton's representations to Deol, the franchisee, about an inexperienced contractor renovating the Monterey store demonstrated Triton's failure to comply with Section 13.1.

13

Under the standard Franchisee Agreement, franchisees were required "to hire a fully qualified licensed and insured" general contractor, chosen from a list of Quizno's-approved contractors, for managing the store's construction. Here, the evidence at trial established the following. Triton gave franchisees a list of Quizno's-approved contractors who could complete construction on a particular store. Despite Triton's policy of rejecting bids from unapproved contractors or investigating them before proceeding further, Triton presented Deol, the franchisee, with a bid from Young, who was an unvetted and unapproved contractor. Young, whose bid was half the cost of the other construction bids that Triton received, had been a contractor for approximately one year building non-electrified metal sheds. Deol accepted Young's bid based on Triton's recommendation and representation that he was Quizno's-approved. On this record, there is substantial evidence showing that Triton did not act in accordance with Section 13.1.

Triton's assertions to the contrary are unpersuasive. To the extent Triton claims there was testimony that Quizno's approved of Young before starting construction, the jury could reasonably reject it. We do not disturb a jury's credibility determination on appeal. (See *Lenk v. Total-Western, Inc.* (2001) 89 Cal.App.4th 959, 968.)

Next, Triton disputes its actions were unethical or dishonest because it simply presented the franchisee with a cost-effective contractor. But Triton was aware that those lower costs, particularly for the electrical work, were partially based on Young's stated intention to use an hourly employee rather an electrical subcontractor. Young admitted he was not an electrician and not competent to inspect electrical work. Meanwhile, Triton acknowledged this was a specialty trade generally performed by an electrical subcontractor, yet there was evidence that Triton did not disclose this information to the

14

franchisee.  In sum, there was substantial evidence of Triton's noncompliance with Section 13.1.

## 2. *Section 9.8, Area Director's Inspections*

Section 9.8. of the Agreement, titled "Area Director's Inspections," provides that "[Triton] shall ascertain through field audits, reviews and inspections, that each Franchisee . . . has complied satisfactorily with all of the terms and conditions of the Franchise Agreement, specifications, standards . . . and Franchisee's Operations Manual . . . ."  Under the Franchisee Agreement, renovations of the restaurant property must "comply with the image, standards or operation and performance capability established" in the Quizno's Architecture and Construction Manual.  Section 9.4 of the Agreement mandates Triton's familiarity with "standards and specifications for the build out . . . of the Restaurant as prescribed from time to time by [Quizno's]."  Section 9.8 also requires Triton to "notify Franchisee in writing with a copy and evaluation report to Franchisor, of any deficiencies."

Contrary to Triton's insistence, the foregoing provisions amply document that Triton's inspection duties extended to the construction of Deol's restaurant.

On that score, there was evidence indicating Triton knew that "all wiring shall be run in conduit"—a requirement in both Quizno's Manual and the construction plans.  Young's failure to encase the toaster oven cable in a protective conduit was obvious and visible, and both Young and a Triton representative acknowledged seeing exposed wiring on the basement ceiling during the inspection of the restaurant.  Triton did not include this deficiency on the "punch list"—a written list provided to contractors of incomplete or unsatisfactorily completed construction items that needed to be fixed—it sent

15

to Young and the franchisee. Finally, while we acknowledge that a franchisee could reasonably rely on Monterey's inspection of the electrical work and that the Agreement did not mandate how Triton was to conduct its inspections, neither circumstance altered Triton's independent obligations to inspect and report to the franchisee any deficiencies under Section 9.8.

In sum, substantial evidence supports a finding that Triton did not act in accordance with its obligations under Section 9.8.

### D.    Causation

Triton next claims there was no evidence that its failures to act in accordance with the Agreement caused the fire. In part, Triton argues that Dr. Vyto Babrauskas—a forensic fire and explosions investigator and FFIC's expert—gave opinion testimony about the cause of the fire based on unestablished predicate facts. In admitting such testimony, Triton claims, the trial court allowed the expert to provide a speculative opinion about the cause of the fire, which failed to establish a causal nexus between the fire and Triton's asserted failures.

### 1. *Additional Facts*

Dr. Babrauskas testified that the fire originated on the specific ceiling joist where the toaster oven electrical cable was attached, a conclusion based on his discussions with other experts, his examination of fire reports, and his review of post-fire photos of the restaurant. The joist bore unique burn damage—a chunk of the wood was gone—compared to the others, the electrical cable connecting to the toaster oven was attached to the joist, but its PVC insulation, a combustible material, had burned off. In Babrauskas's opinion, a malfunctioning wire, the only object that was or could be in that joist space, ignited a fire, and the PVC insulation and wooden joist fueled the fire after ignition.

Dr. Babrauskas also opined that a hammer strike to the PVC-insulated power cable was "the most consistent and the most likely explanation" for the cause of the fire. He explained electrical cable is susceptible to mechanical damage often caused during installation when a hammer is used. Hammer blows to a PVC-insulated cable leave no easily visible mark but render the insulation susceptible to damage during periodic voltage or power surges. In damaged cables, power surges heat the insulation and ignite it as a result of arc tracking—electricity moving between formerly insulated wires in the cable. He noted that the heating element in the toaster oven had previously burned out and that the store experienced excessive light bulb burn outs, all classic symptoms of repeated power surges.

Robert Kilgore testified as FFIC's expert in electrical engineering. Based on a photo of the fire area, he explained the toaster oven cables were improperly bundled together and then nailed to the joist with a two-headed nail. This installation did not conform to the electrical code or city-approved plans because, among other things, the cables were not placed in a conduit. Conduits protect the wire from damage, such as hitting it with a hammer, and protects areas outside of the wires from potential damage if the wires fail. Kilgore's examination of the actual toaster oven cable revealed one area that was kinked, possibly as the result of a two-headed nail, which lined up to where the cable could have been affixed on the joist.

### 2. *Analysis of Dr. Babrauskas's Testimony*

Evidence Code section 802 allows courts to exclude an expert's opinion if it is "based on reasons unsupported by the material on which the expert relies." (*Sargon Enterprises, Inc. v. University of Southern California* (2012) 55 Cal.4th 747, 771; Evid. Code, § 802; see Rest.2d Conf. of Laws, § 138 ["[T]he forum applies its own local law in determining the grounds for

excluding evidence"].) Courts assess whether " 'as a matter of logic, the studies and other information cited by experts adequately support the conclusion that the expert's general theory' " is valid rather than reaching an evaluation of the expert's conclusions. (*Sargon*, at p. 772.) We review the admission of expert testimony for an abuse of discretion. (*Id*. at p. 773.)[4]

While we agree that expert opinions may not be speculative or grounded in unsupported reasoning, that was not the case here. (*Cooper v. Takeda Pharmaceuticals America, Inc.* (2015) 239 Cal.App.4th 555, 576.) Dr. Babrauskas's opinion that the PVC-insulated toaster cable was most likely damaged during installation and caused the fire was based on fire reports, photos of the burn area and bare wires, and research from laboratory tests. (*People v. Sanchez* (2016) 63 Cal.4th 665, 675 [experts may relate information acquired from "lectures, study of learned treatises, etc"].) His description of arc tracking was based on established scientific literature, and he explained it was simply the typical process of how electricity moves from one wire to another when it is damaged. Then he explained the possible consequences of this process. Contrary to Triton's assertions, Babrauskas's opinion was not speculative due to his failure to examine the damaged insulation. As Babrauskas explained, there was no damaged insulation to inspect because it completely burned away. Admitting this testimony was not an abuse of discretion.

---

[4]     We reject FFIC's claim that Triton waived this argument. Triton objected that Dr. Babrauskas's opinion was based on unestablished predicate facts—an accidental hammer strike, power surges, and arc-tracking—before the expert presented any testimony, thus preserving the issue for our review. (*People v. Stamps* (2016) 3 Cal.App.5th 988, 993.)

18

### 3. *Substantial Evidence*

Relatedly, Triton argues there was insufficient evidence supporting the jury's verdict that the fire resulted from, or arose out of or in connection with, Triton's acts not in accordance with the Agreement. "Arising out of" has been construed as "but for" cause under Colorado law. (*Northern Ins. Co. v. Ekstrom* (Colo. 1989) 784 P.2d 320, 323.) Consistent with that interpretation, the trial court instructed the jury that it had to decide "whether 'but for' Triton's conduct the fire would not have occurred," meaning "if the same event would not have occurred without that action or failure to act."

Viewing the evidence as favorably as possible to FFIC, we conclude there was substantial evidence supporting the verdict. (*U.S. Ecology*, *supra*, 129 Cal.App.4th at p. 908.) Undisputed testimony established that the toaster oven cable was installed with a two-headed nail on the wooden joist, that the cable not enclosed in a conduit to protect it from damage during installation, and that the PVC insulation had burned off the cable leaving the bare wire exposed. Dr. Babrauskas identified potential evidence of power surges at the store, such as the toaster oven heating element burning out and excessive light bulb burn outs, which could have resulted in heating up the PVC insulation sufficiently to ultimately ignite the fire.

Dr. Babrauskas's testimony explained that damage to the unprotected toaster oven cable during installation was "most consistent and the most likely explanation of the facts" on cause of the fire. (See *Cooper v. Takeda Pharm. Am., Inc.* (2015) 239 Cal.App.4th 555, 578.) In conveying this opinion, Babrauskas provided "a reasoned explanation illuminating why the facts have convinced [him], and therefore should convince the jury, that it is *more probable than not*" that the faulty installation of the toaster cable caused the damage. (*Ibid.*) Rather than disputing that the toaster oven cable

19

was not in a conduit and thus incorrectly installed, Triton complains there was insufficient evidence that the wire was damaged during the initial installation. But Kilgore's inspection of the wire revealed damage potentially caused by a nail. There was no reason to believe that anyone would have been hammering the insulated cable after installation.

Finally, Triton points out it did not supervise the contractor's employee and had no duty to supervise installation of the conduit. However, the evidence showed a Triton representative was aware that Young was an inexperienced contractor who could not adequately supervise electrical work performed by an hourly employee. Triton's representations to Deol that Young was a Quizno's-approved contractor induced Deol to accept Young's bid. Evidence further established that a competent contractor would understand and properly follow the construction plans and Manual requiring the encasing of all wiring in a conduit, that Triton was aware of this plan requirement, but that Triton did not report this visible defect to Deol. And significantly, Triton does not dispute that a fire would not have occurred if the wires were properly placed in a conduit. Accordingly, there was substantial evidence that the fire would not have happened but for Triton's acts and omissions.

### E. Prejudgment Interest

Finally, we reject Triton's various challenges to FFIC's prejudgment interest award. The initial June 25, 2019 judgment stated FFIC was entitled to recover "$7,841,553.72, plus interest in the amount of $_____. . . ." On August 12, the trial court found FFIC entitled to prejudgment interest starting from March 5, 2015 at a rate of 10 percent pursuant to Civil Code section 3287, and it ordered the parties to confer on the correct sum to be entered into the judgment nunc pro tunc. (Civ. Code, § 3287, subd. (a).) On

20

August 22, Triton filed a notice of appeal encompassing the June 25 judgment, as well as the August 12 order granting FFIC's motion for prejudgment interest. On September 11, 2019, the trial court entered a judgment nunc pro tunc that included the prejudgment interest amount of $3,379,386.97.

Triton claims the August 22 notice of appeal divested the trial court of jurisdiction to set the prejudgment interest amount. (See Code Civ. Proc., § 916, subd. (a).) While an appeal of a judgment generally stays trial court proceedings, a trial court "may proceed upon any other matter embraced in the action and not affected by the judgment or order." (Code Civ. Proc., § 916, subd. (a).) For example, a trial court may correct clerical errors in a judgment nunc pro tunc, despite the pendency of an appeal. (*Gravert v. DeLuse* (1970) 6 Cal.App.3d 576, 581.)

Here, as Triton acknowledges, the trial court's order setting the prejudgment interest amount had no impact on the effectiveness of Triton's appeal. (*Varian Medical Systems, Inc. v. Delfino* (2005) 35 Cal.4th 180, 189.) The September 11 nunc pro tunc judgment simply conformed to the August 12 decision, ordering that the prejudgment interest to which FFIC was entitled should be calculated at 10 percent. (*Theriot v. Superior Court of Los Angeles County* (1963) 221 Cal.App.2d 174, 179 [general rule nunc pro tunc judgment].) In other words, the order "merely quantified the amount of prejudgment interest awarded in the original judgment [and] . . . did not substantially change the original judgment." (*Guseinov v. Burns* (2006) 145 Cal.App.4th 944, 951.) The order was thus outside of the scope of an automatic section 916 stay.

Triton further waived its right to complain about the timing of FFIC's motion seeking prejudgment interest, which was filed after the judgment was

21

entered.  Triton's failure to make this argument in the trial court forfeits its review on appeal.  (*Sea & Sage Audubon Soc'y, Inc. v. Planning Com.* (1983) 34 Cal.3d 412, 417.)

## DISPOSITION

The judgment is affirmed.  Respondent is entitled to its costs on appeal.

_____
Fujisaki, Acting P.J.

WE CONCUR:


_____
Petrou, J.


_____
Wiseman, J.*


A158653


_____
*     Retired Associate Justice of the Court of Appeal, Fifth Appellate District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.